United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GEO. M. MARTIN COMPANY, a
California corporation, and THE
MARTIN FAMILY TRUST – 1989,

    Plaintiffs,

  v.

ALLIANCE MACHINE SYSTEMS
INTERNATIONAL, LLC, a
Wyoming corporation,

    Defendant.
                                        /

No. C 07-00692 WHA

**ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OF
NON-INFRINGEMENT AND
DENYING PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY
JUDGMENT OF INFRINGEMENT**

## INTRODUCTION

In this patent-infringement action, defendant moves for summary judgment of non-infringement. Plaintiffs move for partial summary judgment of infringement. Summary judgment of non-infringement as to claims 5, 12, 16, and 17 is **GRANTED**. But material issues of fact exist with regard to the remaining claims. Accordingly, defendants' motion for summary judgment of non-infringement as to the remaining claims is **DENIED** and plaintiffs' motion for partial summary judgment of infringement is **DENIED**.

## STATEMENT

Plaintiff Martin Family Trust is the assignee of United States Patent No. 6,655,566 B1, and plaintiff George M. Martin Company practices the claimed method as the Trust's purported exclusive licensee. The patent itself is directed to an improvement to a bundle breaker. Bundle breakers are industrial machines that break stacked sheets of material, called "logs," along scored or weakened lines to "bundles" (col. 1:5–15). These machines are frequently used in the corrugated cardboard industry but can be used on a variety of materials such as

1  corrugated paper or board, composition roofing shingles, and paper, plastic, or glass plates (col.
2  1:17–23).

3        The bundle breaker is used in an assembly line, usually near the end of the process.
4  Before going into a bundle breaker, material such as corrugated board is cut into the desired
5  shape and perforated using a rotary die cutter. The resulting sheets are stacked into logs, and
6  the logs are moved into position along a conveyor belt within the bundle breaker. Each sheet in
7  the log has a weakened line where the sheet will eventually be cut along with every other sheet
8  in the same log, said weakened lines all being at the same location on each sheet. The bundle
9  breaker consists of two conveyor belts: an *upstream* conveyor belt and a *downstream* conveyor
10 belt. Logs are brought across the gap between the conveyor belts, clamped into position such
11 that the weakened lines for each sheet align, and severed by pivoting one of the conveyor belts
12 along a vertical axis defined by the gap between the conveyors. Some prior-art machines
13 applied a downward shearing force to cut the sheets, others pivoted the logs along a horizontal
14 axis. A view of the patented bundle breaker is shown below.



1    To speed up the assembly line, it is desirable to break multiple logs simultaneously
2  rather than one log at a time. The prior art already allowed breaking of several side-by-side
3  logs simultaneously. One challenge in separating multiple logs is that the logs may be of
4  different heights. As a result, a clamping mechanism, if uniform in height, may be too low and
5  crush some of the logs, or too high and invite the logs to slip out of position. The industry
6  refers to these problems as "lack of compliance" — the machine places too much force on the
7  taller logs and not enough force on the shorter logs (col. 2:22–31). The '566 patent was
8  directed to a new way to solve the compliance problem.
9    The '566 patent describes an improvement to bundle breakers using a compliance
10  structure allowing the bundle breaker to clamp logs of different heights. The invention detects
11  the heights of the logs — *e.g.*, with an electric eye — and adjusts the clamp height accordingly.



19  The compliance structure (#20, above) then uses a flexible member (#22, above), coupled with
20  a rigid member (#33, above), to clamp the logs. The flexible member deforms in response to
21  pressure so that it can exert more or less equal amounts of pressure on shorter and taller logs.
22  Because the rigid members are not connectedm each can be lowered to different levels to
23  accommodate logs of differing heights. In this way, the improved bundle breaker can clamp
24  taller and shorter logs securely without damaging the resulting bundles and can break one and
25  all simultaneously.
26    This action was filed on February 2, 2007, alleging that defendant Alliance Machine
27  Systems International's Bundle Breaker 3 ("BB-3") infringed all seventeen claims of the '566
28  patent. A claim construction order later construed six phrases chosen by the parties. Alliance

now moves for summary judgment of non-infringement. Plaintiffs move for partial summary judgment of infringement.

**ANALYSIS**

**1. LEGAL STANDARD.**

**A. Summary Judgment.**

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). A district court must determine, viewing the evidence in the light most favorable to the non-moving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

In the patent context, although the comparison of the claims to the accused system is a fact question, summary judgment may be granted if no reasonable jury could find infringement. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8 (1997). Literal infringement occurs when each limitation found in a properly construed claim literally reads on the accused product. The scope of a patent, however, "is not limited to its literal terms but instead embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 732 (2002). An accused product may be equivalent to the claims of a patent "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950).[1]

**B. Claim Construction.**

Those terms raised on Alliance's motion for summary judgment that were not addressed in the claim construction order dated November 16 now require construction. This

---

[2] Unless otherwise stated, all internal citations are omitted from this order.

4

is a matter of law to be decided by a judge, not a jury. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). Courts must give words in the claims their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

Where this ordinary and customary meaning is not immediately clear, courts must primarily look to intrinsic evidence (*i.e.*, the claims, the specification, and the prosecution history) to determine the meaning. *Id*. at 1314. With respect to the specification, although a difficult task, a court must distinguish "between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim." *Id*. at 1323. The latter is not permissible.

Although courts have the discretion to consider extrinsic evidence, including expert and inventor testimony, dictionaries and scientific treatises, such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id*. at 1317. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*. at 1315. "Nonetheless, any articulated definition of a claim term ultimately must relate to the infringement questions it was intended to answer." *E-Pass Tech., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1219 (Fed. Cir. 2007).

2. **CLAIMS 1 TO 15.**

Claims 2 to 15 of the '566 patent all depend from claim 1, which was stated in Jepson form. A Jepson claim has three parts: (1) a preamble that recites all elements of the claimed invention which are known in the prior art; (2) a transition phrase such as "wherein the improvement comprises;" and (3) a recitation of those elements of the claimed invention that the patentee considers new or improved over the prior art. 37 C.F.R. 1.75(e). When a claim is written in Jepson form, "the claim preamble defines not only the context of the claimed invention, but also its scope." *Rowe v. Dror*, 112 F.3d 473, 479 (Fed. Cir. 1997).

5

Claim 1 states in relevant part (col. 16:56–17:3):

> An improvement in a bundle breaker for separating bundles from a log having a generally planar top surface,
>
> said log including a plurality of sheets each having a generally planar top surface and each sheet is formed with at least one weakened line,
>
> said weakened lines are vertically aligned in said log forming a weakened plane in said log, said bundle breaker including a first conveyor for conveying said log and having an upstream end for receiving said log and a downstream end,
>
> and a second conveyor having an upstream end positioned immediately adjacent to said downstream end of said first conveyor providing *a gap therebetween defining a bundle breaking plane*,
>
> said bundle breaker including first clamp means mounted for vertical reciprocating movement above said first conveyor,
>
> and said second clamp means mounted above said second conveyor for vertical reciprocating movement in relation to said second conveyor and
>
> said second conveyor and said second clamp means *mounted for conjoint pivotal movement in relation to said bundle breaking plane* for progressively breaking a bundle from said log along said *weakened plane in said log*,
>
> said improvement comprising:
>
> (a) a first compliance structure mounted on said first clamp means including,
>
> (1) *a first fluid pressurized structure* . . . and
>
> (b) a second compliance structure mounted on said second clamp means including,
>
> (1) *a second fluid pressurized structure* . . . .

Alliance argues that the BB-3 does not infringe claim 1 because: (i) its "bundle breaking plane" and the pivot point for its downstream conveyor are not defined by the "gap" between the conveyor belts and (ii) the BB-3 does not have a second fluid pressurized structure.

6

### A. Disputed Terms.

#### (1) "A Gap Therebetween Defining A Bundle Breaking Plane."

Plaintiffs propose the term "a gap therebetween defining a bundle breaking plane" should mean "a generally vertical area that is defined by the downstream end of the first conveyor and the upstream end of the second conveyor." Alliance argues the phrase should have its "plain and ordinary meaning" — "the recited gap between the first and second conveyors defines the bundle breaking plane." Alliance goes on to define "a bundle breaking plane" as "the plane in the machine on which the bundle is aligned for breaking."

The difficulty with Alliance's construction is that it fails to define the "gap." According to Alliance, the ordinary and plain meaning of gap refers to the space between the two closest points of the conveyor belts, *i.e.*, the narrowest possible "gap." The claim language, however, states:

> said bundle breaker including a first conveyor for *conveying* said log and having an upstream end for receiving said log and *a downstream end*, and a second conveyor having *an upstream end* positioned immediately adjacent to said downstream end of said first conveyor providing a gap therebetween . . . (emphasis added).

This order holds that the gap therebetween refers to the space between the point where the log loses contact with the upstream conveyor and the point where the log acquires contact with the downstream conveyor. These are the points that matter. A log can be moved by the belts only where they are touching the log. Once the belt turns downward and loses contact, the belt has no role. The gap, therefore, should be measured from where the belt turns downward. Moreover, a moments thought can imagine a belt configuration where the under carriage of the belt actually extends under the other conveyor, in which case there would be no gap at all under defendant's proposal.

#### (2) "Mounted For Conjoint Pivotal Movement In Relation To Said Bundle Breaking Plane."

The parties next part company as to the meaning of "mounted for conjoint pivotal movement in relation to said bundle breaking plane." Plaintiffs argue the phrase should mean "a rotating or turning action of the conveyors or clamp in relation to a bundle breaking plane in

7

order to progressively break bundles from the logs." Alliance argues the phrase should mean "the second conveyor and clamp must be mounted to pivot about a bundle breaking plane defined by the gap between the conveyors."

Neither party has given any significant justification as to why the entire phrase needs any construction at all. The only word in the phrase that requires construction is "conjoint." The plain meaning of the rest of the phrase is straightforward. Plaintiffs' construction adds nothing beyond explaining the purpose of the "pivotal movement." Alliance's construction unnecessarily imports language from another part of the claim (*i.e.*, "defined by the gap between the conveyors"). All the claim language requires is that the conveyors and clamp be mounted to allow for conjoint pivotal movement in relation to the bundle breaking plane. The "conjoint" limitation calls for the conveyors and clamp to be mounted to allow the two to pivot together as opposed to pivoting independently of one another. In this regard, "conjoint" refers to a combined pivotal movement.

This order holds that "conjoint" means "combined" and that the remaining terms in the phrase "mounted for conjoint pivotal movement in relation to said bundle breaking plane" require no further construction and may be sufficiently understood by a layperson.

### B. Bundle Breaking Plane.

Alliance argues that its accused BB-3 does not infringe claims 1 to 15 because: (i) the bundle breaking plane in the BB-3 is a vertical plane that cuts through the upstream conveyor and (ii) the downstream conveyor and clamp pivot in relation to a vertical plane cutting through the upstream conveyor and not in relation to the gap between the conveyors. These two non-infringement contentions are intertwined. The claim language requires that the pivot movement be made in relation to the bundle breaking plane. Because the bundle breaking plane in the claimed invention is defined by the gap between the conveyors, the pivot movement would thus be made in relation to that gap.

#### *(1) Literal infringement.*

Alliance's non-infringement contention hinges on its proposed construction for the term "gap." This construction has already been rejected. In the BB-3, the bundle breaking

8

1  plane is not located between the two closest points of the upstream conveyor belt and
2  downstream conveyor belt. There is, however, a fact question as to whether the BB-3's bundle
3  breaking plane is located between where the logs lose contact with the first conveyor belt and
4  where the logs initiate contact with the second conveyor belt. On the current record, it is
5  unclear exactly where the bundle breaking plane in the BB-3 is located. In addition, there is a
6  question of fact as to whether the downstream conveyor and clamp in the BB-3 are mounted to
7  pivot in relation to the bundle breaking plane (defined by the gap). Alliance argues that
8  because the downstream conveyor and clamp are not mounted to pivot on an axis lying on the
9  gap between the conveyors that there can be no literal infringement. This is not so. All the
10 clam language requires is that the conveyor and clamp be mounted to pivot *in relation* to the
11 bundle breaking plane, *not* that the pivot point be on a vertical axis directly above or below the
12 bundle breaking plane. A clamp not mounted on a vertical axis aligned with the bundle
13 breaking place can still pivot in relation to the plane.

### *(2) Infringement Under the Doctrine of Equivalents.*

15    As an initial matter, Alliance contends that plaintiffs have waived all infringement
16 contentions made under the doctrine of equivalents because they have disclosed no
17 infringement theory demonstrating how an equivalent of the limitation is found in the BB-3.
18 For support, Alliance argues that plaintiffs' preliminary infringement contentions and expert
19 reports contain merely conclusory and overbroad statements regarding infringement under the
20 doctrine of equivalents. Alliance's requested relief goes too far. But this does not mean that
21 any shortfalls in plaintiffs' infringement contentions will be excused. At trial, plaintiffs'
22 infringement argument will be limited to the four corners of the expert reports that they have
23 provided. Alliance may bring a separate motion in limine to determine whether plaintiffs'
24 expert should be limited to testimony on literal infringement because his statements regarding
25 infringement under the doctrine of equivalents were conclusory or inadequate.

26    Alliance next argues that any finding of equivalence would be barred as a matter of law
27 under the "all-limitations" rule. The all-limitations rule provides that the doctrine of
28 equivalents cannot apply where "applying the doctrine would vitiate an entire claim

9

limitation." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). A specifically excluded alternative cannot be recaptured under the doctrine of equivalents. *See Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996). This principle applies regardless of whether the exclusion is express or implied. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345–47 (Fed. Cir. 2001) (discussing various decisions on this principle). Yet, "a claim is not vitiated merely because it does not literally exist in the accused product — such an interpretation of the 'all elements' rule would swallow the doctrine of equivalents entirely." *Abbott Labs v. Inc. Andrx Pharms., Inc.*, 473 F.3d 1106, 1212 (Fed. Cir. 2007).

In light of the issues of fact discussed above, it is not clear that the all-limitations rule applies here. As such, at trial the jury will be properly instructed as to the all-limitations rule.

### C. Second Fluid Pressurized Structure.

The term "fluid pressurized structure" was construed in the November 16 order to mean "a structure capable of being sealed, containing a liquid or gas at greater than atmospheric pressure that applies force to the inside of the structure" (Opin. 9). The BB-3 has four bladders: two on the upstream clamp and two on the downstream clamp (Roth Decl. ¶ 8). These four bladders are connected with flexible tubing so that pressurized air can flow among them. But the air bladders cannot be individually sealed or pressurized. Rather, the four bladders can only be sealed and pressurized together by a single pressure regulator.

Alliance argues that the BB-3 does not have a second fluid pressurized structure because the four air bladders cannot be pressurized independently. Under Alliance's theory, the BB-3 has only one fluid pressurized structure and therefore does not infringe claim 1. Not so. Alliance improperly imports an additional limitation into the claim, namely that the first and second fluid pressurized structures operate independently. There is no support for this inclusion. Nowhere in the express language of the claim or the specification does it state the two pressurized structures must be able to pressurize independently. In fact, Alliance has offered no support for its argument. Not even its own experts have explained why the claim

10

1 requires the pressurized structures to operate independently. Summary judgment of

2 non-infringement as to claim 1 is therefore **DENIED**.

### 3. CLAIMS 5 AND 12.

Claim 5 states (col. 17:41–52):

> An improvement in a bundle breaker as defined in claim 1 comprising:
>
> a. said first and second fluid pressurized structures are each formed with a generally planar upper rigid wall affixed to said first and second clamp means, and a depending perimeter wall affixed to and extending downwardly from said generally planar upper rigid wall of said first and second fluid pressurized structures;
>
> b. *said first and second flexible members are joined to said respective perimeter walls in pressure sealing engagement therewith* . . . .

Claim 12 depends on claim 5. The term "pressure sealing engagement" was construed by the November 16 order to mean "an interface between two surfaces that maintains liquid or gas pressure" (Opin. 10).

Alliance correctly argues that the BB-3 does not infringe claim 5 or 16 because its flexible members are not joined in a pressure sealing engagement with the perimeter walls (Roth Decl. ¶ 9). Plaintiffs do not dispute that the flexible members, *i.e.*, the air bladders, in the BB-3 are not joined to the perimeter wall. They instead argue that when fully inflated, the air bladders have the ability to make some contact with the perimeter walls thereby creating some pressure between the two surfaces. This argument is unconvincing. That the air bladders — when fully inflated — have the ability to touch the perimeter walls does not by implication mean the BB-3 meets the claim limitation. Plaintiffs point to no evidence that any interface between the air bladders and the perimeter walls maintains a pressure sealing engagement. Plaintiffs go on to state, "Alliance apparently contends that 'pressure sealing engagement' requires that the flexible member must be attached to the perimeter wall." Alliance, however, is only stating what is expressly in the claim: "said first and second flexible members are *joined* to said respective perimeter walls." No flexible members in the BB-3 are joined to the perimeter walls in a pressure sealing engagement. There can be no literal infringement.

11

In addition, the BB-3 does not infringe under the doctrine of equivalents because any finding of equivalence would necessarily eliminate the entirety of limitation (b) in claim 5. The BB-3 has no flexible members attached to the perimeter walls and no pressure engagement is created therewith. Plaintiffs have put forth no theory demonstrating how the accused device would infringe under the doctrine of equivalents. Accordingly, summary judgment of non-infringement as to claims 5 and 12 is **GRANTED**.

### 4. CLAIMS 16 AND 17.

Claim 16 is the only other independent claim of the '566 patent. Claim 17 is dependent on claim 16. Claim 16 states (col.18:66–19:13):

> An improvement in a bundle breaker for shearing progressively a bundle of sheets along a weakened plane from a log, said bundle breaker including first and second adjacent but longitudinally spaced upper and lower clamping surfaces, the improvement comprising:
>
> a. first and second compliance structures positioned between said first and second, upper and lower clamping surfaces;
>
> b. said first and second compliance structures including first and second detection means detecting the height of said log;
>
> c. *variation setting means reducing the distance* between said upper and lower clamping surfaces *a selected increment* after detecting the height of the said log.

The means-plus-function term "variation setting means" has already been construed in the November 16 order to mean "reducing the distance between said upper and lower clamping surfaces a selected increment" with a computer or similar device operating as the corresponding structure (Opin. 13–14). The parties agree that "reducing the distance . . . a selected increment" means that the distance between the upper and lower clamps is reduced by a specific operator-defined distance.

### A. Infringement.

The BB-3 does not reduce the *distance* between its upper and lower clamps by a preselected incremental distance (Roth Decl. ¶ 12). Rather, the computer in the BB-3 lowers the upper clamp until a preselected clamping *pressure* (detected by a sensor) is reached.

12

When this preselected pressure is reached, the downstream clamp and conveyor pivot to break the sheets. The computer thus lowers the upper clamp — without regard to any increment of distance — until a preselected pressure is reached.

### 1.     *Literal Infringement.*

Plaintiffs concede that the BB-3 does not lower any clamp by a preselected distance and hence does not literally infringe claim 15. They rely solely on the doctrine of equivalents to support their infringement contention.

### 2.     *Infringement Under the Doctrine of Equivalents.*

Plaintiffs argue that the BB-3 embodies all the elements of claim 15 because lowering the clamp until a preselected pressure is reached is an insubstantial change in design. This order does not reach this question because plaintiffs are barred from claiming the subject matter under the "disclosure-dedication" rule.[2] As the court held in *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 2002):

> A patentee may not narrowly claim his invention and then, in the course of an infringement suit, argue that the doctrine of equivalents should permit a finding of infringement because the specification discloses the equivalents. Such a result would merely encourage a patent applicant to present a broad disclosure in the specification of the application and file narrow claims, avoiding examination of broader claims that the applicant could have filed consistent with the specification.

If the patentee makes a disclosure in his specification, but chooses not to claim such disclosure, he cannot later claim infringement under the doctrine equivalents for the very disclosure which he chose not to claim. To invoke the disclosure-dedication rule "[t]he disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004).

---

[2] Despite the fact Alliance raised the disclosure-dedication argument in its opening brief, plaintiffs did not address the issue anywhere in their opposition.

13

Here, the concept of using pressure to lower the clamp was well known in the prior art. The Shill '267 patent (the same reference plaintiffs relied on to support their infringement contention for claims 1 to 15 above) stated (col. 10:7–16):

> A pressure sensing transducer is located in the hydraulic circuit to sense pressure in the lines. As the clamps close and engage the stack, pressure in the hydraulic lines increase. The increased pressure is sensed by the transducer which sends a signal of between 2 and 20 milliamps, depending upon the pressure sensed, to the microprocessor. When the transducer signal input reaches the programmed set point in the controller, the valve shifts and locks the clamps in position at the selected clamping pressure.

The Shill patent was expressly referenced and discussed in the '566 specification and cited by the examiner on the face of the patent. The '566 specification further explained (col 10:13–24):

> In order to break two bundles simultaneously from logs 4 and 4', in which log 4' is higher than log 4, a minimum selected pressure must be applied to both logs . . . . It is also important that a substantially greater pressure than this minimum selected pressure not be applied to the taller stack of corrugated board or log to prevent crushing of the sheets in the taller stack. In other words, the object of this invention is to apply the same pressure to both logs even if one log is higher than the other log.

This order finds that one of ordinary skill in the art would have been able to identify that pressure based clamping was a substitute for distance based clamping upon reading the '566 specification. The main goal of the invention was to allow an equal distribution of pressure to be applied across logs of differing heights. The Shill patent was expressly referenced in the specification and taught the use of a pressure threshold to define how far the clamp would be lowered. Plaintiffs have already attempted to use the disclosure in the Shill patent to support their infringement contentions in regards to claims 1 to 15. Such use applies both ways.

Had the patentee thought the invention behind the '566 patent included bundle breakers employing a pressure-based system for lowering the clamps it should have been claimed at the time of examination. Claim 16 could have been drafted to eliminate the limitation that the clamp be lowered by a *preselected* distance and instead that it simply be lowered by a distance, thereby capturing the accused product. This, however, was not done. Plaintiffs cannot now

14

recapture this subject matter under the doctrine of equivalents when it was disclosed in the original application, but not claimed. The public must be able to rely on the claims of a patent to define the scope of the invention. Allowing plaintiffs to broaden their claims to cover subject matter that should have been claimed at the time of prosecution would defeat this objective.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment of non-infringement is **GRANTED** as to claims 5, 12, 16, and 17. Summary judgment of non-infringement as to the remaining claims is **DENIED**. Plaintiffs' motion for partial summary judgment of infringement is **DENIED**.

**IT IS SO ORDERED.**

Dated: April 28, 2008.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE