1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GEO. M. MARTIN COMPANY, a
California corporation, and THE MARTIN
FAMILY TRUST – 1989,                                    No. C 07-00692 WHA

        Plaintiffs,

  v.                                              **ORDER GRANTING
                                                        DEFENDANT'S RULE 50
ALLIANCE MACHINE SYSTEMS                                MOTION ON THE ISSUE
INTERNATIONAL, LLC, a Wyoming                           OF OBVIOUSNESS**
corporation,

        Defendant.
_____/

## INTRODUCTION

In this patent infringement action, defendant Alliance Machine Systems International, LLC, moves for judgment as a matter of law on the issue of obviousness after a two-week jury trial that resulted in a hung jury. For the reasons set forth below, Alliance's motion is **GRANTED**.

## STATEMENT

The history of this case has been explained in prior orders. In brief, plaintiff Martin Family Trust is the assignee of United States Patent No. 6,655,566 B1, and plaintiff George M. Martin Company practices the claimed method as the Trust's exclusive licensee.

The patent itself is directed to an improvement in bundle breakers. Bundle breakers are industrial machines that break stacked sheets of corrugated or other material, called "logs," along perforated, scored or otherwise weakened lines into "bundles" (col. 1:5–15). These machines are frequently used in the corrugated cardboard industry but can be used on a variety of materials such as corrugated paper or board, composition roofing shingles, and paper, plastic, or glass plates (col. 1:17–23).

**United States District Court**
For the Northern District of California

1    A bundle breaker is used in an assembly line, usually near the end of the line.  Before

2    reaching a bundle breaker, material such as corrugated board is cut into the desired shape and

3    perforated, usually using a rotary die cutter.  The resulting sheets are stacked into logs, each log

4    about two feet high, and the logs are moved into position along a conveyor belt.  Each sheet in the

5    log has a weakened (or perforated) line along which all of the sheets will eventually be broken,

6    said weakened lines arranged one on top of another so that they align vertically from the bottom

7    of the log to the top of the log.  So arranged, the log can be broken in half in one fell swoop.

8    A bundle breaker has two conveyor belts:  an *upstream* conveyor belt and a *downstream*

9    conveyor belt.  Logs are moved to straddle the gap between the conveyor belts, where they are

10   halted, are clamped into position, and are broken by pivoting one of the conveyor belts while the

11   other belt and clamp holds the other side of the log in a fixed position.  All of this was well known

12   in the prior art.

13   A view of the patented bundle breaker is shown below, but prior art machines looked

14   similar in all the major features:

15



Figure 21 from '566 Patent

2

United States District Court

For the Northern District of California

As stated, bundle breakers were well known in the prior art.  Bundle breakers wide enough to accommodate two or more side-by-side logs at once were also known.  Earlier machines also used pivot action as the means to break the logs.

The patent in suit was aimed at a way to send two or more logs through side by side and to break them in one pivot of the conveyor belt and *to accommodate slightly different log heights in doing so*, the italicized language being the supposed improvement over the prior art.

To speed up the assembly line, it has long been desirable to break multiple logs simultaneously rather than one log at a time.  As stated, the prior art already allowed breaking of several side-by-side logs simultaneously.  One challenge for side-by-side logs, however, occurred when the logs were of slightly different heights such as 26 inches versus 25 and a half inches.  As a result, a prior art clamping mechanism would put more pressure on the taller log and less on the shorter log.  This would invite the logs to slip out of position or possibly crush the taller one.  The prior art referred to this as "lack of compliance" (col. 2:22–31).  The '566 patent was directed to a supposed new way to solve the compliance problem.

The '566 patent described an improvement to bundle breakers using a "compliance structure" that adjusted to the different heights.



Figure 20 from '566 Patent

The "compliance structure" (*e.g.*, #20 above) then used a "flexible member" (*e.g.*, #22 above), coupled with a "rigid member" (*e.g.*, #33 above), to clamp the logs.  The flexible member deformed in response to pressure so that it could exert more or less equal amounts of pressure on shorter and taller logs via the various rigid members.  The rigid members were not connected and indeed were floating subject to pressure from the flexible member.  In this way, the improved

3

United States District Court

For the Northern District of California

1   bundle breaker could clamp taller and shorter logs securely without damaging the resulting

2   bundles and could break one and all simultaneously.  (Of course, if the overall clamping pressure

3   was set too high, then the bundle breaker would crush all of the logs but at least it would not crush

4   a log simply because it was too tall.)

5          After Martin came out with its new bundle breakers, Alliance responded with its own new

6   entry.  Martin then accused Alliance of infringing the '566 patent.  This order assumes for the sake

7   of argument that the accused device did and still infringes.

8          After extended discovery and motion practice, the case was ready for trial.  A bench trial

9   was first held on "standing" to determine whether Martin was actually the *exclusive* licensee of the

10  '566 patent and a proper plaintiff.  After hearing two days of evidence, the Court found that Martin

11  was the oral exclusive licensee of the '566 patent and a proper party to the lawsuit.  A jury trial on

12  the issues of infringement and invalidity came next.  Martin asserted claims 1, 2, 3, 4, 7, 13, and

13  14.  Claim 1 was the only independent claim asserted.  It provided in relevant part (col.

14  16:56–17:3):

15          An improvement in a bundle breaker for separating bundles from a log
            having a generally planar top surface,

16
            said log including a plurality of sheets each having a generally
17      planar top surface and each sheet is formed with at least one
        weakened line,
18
            said weakened lines are vertically aligned in said log forming
19      a weakened plane in said log, said bundle breaker including a first
        conveyor for conveying said log and having an upstream end for
20      receiving said log and a downstream end,

21          and a second conveyor having an upstream end positioned
        immediately adjacent to said downstream end of said first conveyor
22      providing a gap therebetween defining a bundle breaking plane,

23          said bundle breaker including first clamp means mounted for
        vertical reciprocating movement above said first conveyor,
24
            and said second clamp means mounted above said second
25      conveyor for vertical reciprocating movement in relation to said
        second conveyor and
26
            said second conveyor and said second clamp means mounted
27      for conjoint pivotal movement in relation to said bundle breaking
        plane for progressively breaking a bundle from said log along said
28      weakened plane in said log,

4

said improvement comprising:

        (a) a first compliance structure mounted on said first clamp means including,

            (1) a first fluid pressurized structure having a first flexible member presenting a first engagement area for operative engagement with an upstream portion of said generally planar top surface of said log and on the upstream side of said weakened plane in said log; and

        (b) a second compliance structure mounted on said second clamp means including,

            (1) a second fluid pressurized structure having a second flexible member presenting a second engagement area for operative engagement with a downstream portion of said generally planar top surface of said log and on the downstream side of said weakened plane in said log.

Alliance contended that all claims were invalid based on anticipation, on sale, and obviousness grounds.  The trial lasted two weeks and after four days of deliberation the jury announced it could not reach a verdict.  Alliance now moves for judgment as a matter law on the issue of invalidity.[1]

## ANALYSIS

Pursuant to Rule 50(a)(1), judgment as a matter of law may be granted against a party if it "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  Alliance moves for a judgment as a matter of law as to invalidity on two separate grounds:  anticipation and obviousness.  This order only reaches the latter ground.

A patent is presumed valid, and the burden of establishing invalidity as to any claim of a patent rests upon the party asserting such invalidity.  35 U.S.C. 282.  Invalidity must be proven by clear and convincing evidence.  Although not susceptible to precise definition, "clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).[2]

---

[1] No summary judgment motion relating to validity was ever made by either party.

[2] Unless indicated otherwise, internal citations are omitted from all quoted authorities.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Under 35 U.S.C. 103, a patent may not be obtained if the differences between the claimed

2 invention and the prior art would have been "obvious" at the time the invention was made to a

3 person having ordinary skill in the art to which the patent is directed. The Supreme Court recently

4 addressed the issue of obviousness in *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007). In so

5 doing, the Supreme Court emphasized that the obviousness inquiry is pragmatic and flexible:

6 "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id*. at 1742.

7 The Supreme Court further stressed that if a person having ordinary skill in the art would have

8 been able to implement a predictable variation of the prior art to yield the claimed invention,

9 Section 103 would likely bar patentability. As the Supreme Court stated in *KSR Int'l Co.*,

10 127 S.Ct. at 1740–41:

11    Often, it will be necessary for a court to look to interrelated teachings
     of multiple patents; the effects of demands known to the design
12    community or present in the marketplace; and the background
     knowledge possessed by a person having ordinary skill in the art, all in
13    order to determine whether there was an apparent reason to combine
     the known elements in the fashion claimed by the patent at issue.

14

15 Where there is "a design need or market pressure" to solve a particular problem and there are only

16 a discrete number of predictable solutions that led to the anticipated success of the patent, "[the

17 patent] is likely the product not of innovation but of ordinary skill and common sense." *Id*. at

    1742.

18

19    In evaluating the question of obviousness, the scope and content of the prior art are to be

20 determined, the differences between the prior art and the claims at issue are to be ascertained, and

21 the level of the person having ordinary skill in the art is to be resolved. After such analysis,

22 secondary considerations such as commercial success and failure of others may be considered as

23 indicia of obviousness or nonobviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1,

    17 (1966).

24

25    At trial, several prior-art devices were studied. Those devices were the Visy, Pallmac, and

26 Tecasa machines. The level of ordinary skill in the art was not in dispute. This order finds that the

27 only reasonable view of all of the evidence is that the claims in suit were obvious and that this was

28 clear and convincing on the trial record. Alliance's Rule 50 motion on obviousness must be

    **GRANTED**.

**United States District Court**
For the Northern District of California

1. **SCOPE AND CONTENT OF THE PRIOR ART.**

   A. **Visy Machine.**

Many years before the alleged invention, the Visy device was designed by a former Alliance employee, Travis Hanson, specifically for a corrugated-board company in Australia, the Visy company, that had requested bundle breakers that could accommodate bundles of uneven heights. As shown below in Figure A, the Visy device had steel U-shaped grippers attached to its upper clamping mechanism with air bags located inside the grippers.



Figure A: Side View of Visy Device

Flexible air tubing connected all of the air bags so as to allow the air pressure to equalize and to apply the same downward force across all grippers. Logs of uneven height would then come onto the conveyor belts, the grippers would lower, and as the grippers engaged the logs, air would be pushed in and out of the air bags in proportion to the pressure on each so as to redistribute and more equalize the pressure.[3] *This was exactly the principle espoused in the patent in suit.*

The Visy device was not before the examiner. The device was designed in 1995. The filing date on the '566 patent was seven years later. It was stipulated to at trial that the Visy device was sold in the United States well before the invention date claimed for the '566 patent by Martin. In addition, Martin only argued that a few claim limitations were not found in the Visy device. Those limitations were: (i) "compliance structure" in claim 1; (ii) "presenting a first engagement area for operative engagement" in claim 1; (iii) "with at least one log having a height greater than at least one other log" in claim 3; (iv) "have a width extending substantially the width of said logs" in claim 4; and (v) "closely spaced" in claim 7. At trial, plaintiffs conceded that eight

---

[3]  The physical structure of the Visy device was undisputed.

copies of the machine were made and installed in a Visy production line in Australia.  Plaintiffs concentrated their fire on the contention that the eight copies were dogged by operational problems and therefore "didn't work."[4]

The Visy device included a total of 22 air bladders:  eleven upstream and eleven downstream.  The eleven on top were interconnected.  The eleven on bottom were interconnected. Logs of uneven heights would be conveyed across the upstream and downstream belts.  The upper clamping mechanism, along with the grippers, would then lower and apply force across the logs. Because the grippers would contact the taller log first, a greater force would normally be exerted across the taller log.  The air bags located inside the grippers, however, would deform (much the same way as taught in the '566 patent) and instantly push out air into the other air bladders in the system, including to the bladders in the grippers located above the shorter log.  In this way, much of the force on the taller log was re-distributed to the shorter log.

Daniel Talken, a named inventor of the '566 patent and Martin's corporate representative, openly admitted to the deforming capacity of the Visy machine:

> Q.  And this is the air seal that's inside the gripper.  And the gripper pushes up onto that air seal, correct, and that moves up as well, correct?
>
> A.  That's correct.
>
> Q.  And when it pushes up far enough, it will press up against this plate, and compress that air seal a little bit, correct?
>
> A.  Correct.
>
> Q.  And that will push the air out of that particular air seal, and it will circulate to the other air seals, because they're all plumbed together, correct?
>
> A.  That's correct.

Martin's expert, Dr. Albert Karvelis, confirmed (Tr. 1859:23–1860:19):

> Q.  Now you would agree with me, Dr. Karvelis, that the air bladders in the Visy air clamping option were connected to each other.  Is that right?  You'd agree with that, right?
>
> A.  There [sic] are fluid dynamically connected.

_____

[4]  Martin also disputed the general claim language stating "[a]n improvement in a bundle breaker."

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Q.  Well they were plumbed together, right?

A.  Yes, two different ways, and during the life of the Visy machine –?

Q.  And initially they were all interconnected.  They had 11 air bladders running across the width of the machine.  And those were all interconnected, right?

A.  Again, yes.  If you mean interconnected in the two different that Visy – they attempted to connect them both directly A, to B, to C, to D.

*          *          *

Q.  And you would agree with me that those connection allow the air to flow between the air bags in the Visy air clamping option at sonic velocities, right?

A.  Yes, that's true.

Q.  And "sonic velocities" means the speed of sound, or thereabouts?

A.  Yes, sir, that's true.

Significantly, the term "compliance structure" appearing in claim 1 was construed to mean "a structure that deforms to allow a *more uniform* distribution of force."  This is exactly what the Visy machine did.  Talken's own self-run tests on a Visy replica machine (constructed by Martin) conclusively established that the Visy machine provided a more uniform distribution of force across logs of differing heights.  Talken first tested the amount of force that was applied by a bundle-breaking device identical to the Visy machine except that the device had flat solid platens that could not move (as opposed to the deformable structure of the Visy machine) on two logs of differing heights.  The test showed that the difference in the force applied to the tall log and the short log on the solid-platen device was 1200 lbs.  When the same test was run on the Visy replica machine, the difference was only 450 lbs.[5]

---

[5] Talken maintained that the relevant inquiry to his test was how the force was applied across a given area and not the absolute force actually applied — *i.e.*, the applied pressure is what allegedly matters.  This argument fails for two reasons.  *First*, the asserted claims do not require that "equal pressure" be applied to the two logs.  All they require is that there be a more uniform distribution of *force*.  In fact, during the claim construction briefing, Martin expressly rejected the idea that the claims required an equal pressure to be applied to the logs:  "While the specification refers to situations where the pressure on the logs will be the same, the claims contain no such requirement, nor is any such requirement necessary to satisfy the purpose of the invention" (Martin Claim Const. Brief, Dkt. 41, at 12).  Martin cannot have it both ways.  *Second*, that the Visy machine may have applied too much force on a select area thereby damaging a log only speaks to whether or not

9

United States District Court

For the Northern District of California

1    The main argument raised by Martin at trial was that the Visy machine was not prior art

2    because it allegedly failed to work for its intended purpose.  In order to qualify as prior art, a

3    reference "must be sufficient to enable one with ordinary skill in the art to practice the invention."

4    *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).  "An

5    invention is reduced to practice when it works for its intended purpose.  An invention is said to

6    work for its intended purpose when there is a demonstration of its workability or utility."

7    *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1366–67 (Fed. Cir. 2008).

8    An alleged problem with the Visy machine, as argued by Martin, was that its grippers were

9    spaced more widely apart than the Marin design, causing too much pressure to be exerted on the

10   bundles leading to dents (in the logs) during breaking.  Although the evidence is somewhat

11   competing, Martin proffered testimony and documents from former Visy operators demonstrating

12   that the Visy machine had some problems running in a day-to-day commercial environment

13   because, at times, it damaged boards and broke down.  For its part, Alliance proffered testimony

14   from other operators demonstrating that the Visy machine performed relatively successfully and

15   was able to effectively break bundles of differing heights.

16   Even if Martin's proffered evidence is fully credited, however, the Visy machine still

17   qualifies as prior art.  The evidence is undisputed that the Visy machine was capable of regularly

18   breaking logs of varying height.  To argue otherwise, Martin took refuge in a mantra, heard over

19   and again before the jury, that the Visy machines had to reach a commercially satisfactory stage in

20   order to qualify as prior art.  "However, there is certainly no requirement that an invention, when

21   tested, be in a commercially satisfactory stage of development in order to reduce the invention to

22   practice."  *DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122, 1126

23   (Fed. Cir. 1991); *see also Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*,

24   731 F.2d 831, 838 (Fed. Cir. 1984) ("[I]t is immaterial that the device was a makeshift or 'Rube

25   Goldberg' embodiment").  All that is required is that the device be in a substantial form "which

26   demonstrate[s] at once its practical efficacy and utility."  *Coffin v. Ogden*, 85 U.S. 120, 124

27   (1873).

28

it was a commercially satisfactory product — an issue which is addressed further below.

United States District Court

For the Northern District of California

That test was plainly met here.  No doubt, the Visy machine had its problems on the manufacturing floor and dented some boards, but the germane evidence shows that the Visy machine broke multiple logs of uneven heights on a regular basis.  It did not operate flawlessly but it operated on exactly the same principle espoused in the patent as the essence of the invention — a hydraulic flexible system installed on the upper set of clamps.

It can also not be forgotten that the relevant comparison is between the claims and the prior art reference.  In this regard, the claims do not require that the invention break bundles flawlessly.  On multiple occasions, as stated, Martin has urged that the pertinent inquiry is whether or not the prior art reference worked for its intended purpose as defined by customer satisfaction.  (Eventually Visy disabled the machines after at least months of production-line usage.)  This is not the proper test.  Rather, the prior art reference must work for its intended purpose within the meaning of the patent.  *See Atlanta Attachment Co.*, 516 F.3d at 1367 ("Moreover, because vibration-free operation was not a claimed feature, it would only be relevant if the vibration actually prevented workability or utility of the invention.  Atlanta Attachment has not presented such evidence"); *see also z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) ("We agree.  z4's patents do not disclose a method or apparatus to completely eliminate software piracy, and the claim language indicates that the purpose of the invention is merely the reduction, rather than the elimination, of such piracy").  When the proper standard is applied, it is apparent that the Visy machine worked sufficiently for its intended purpose as contemplated by the asserted claims.[6]

Martin also argues that the Visy machine should not be considered as prior art because it was allegedly abandoned.  Under 35 U.S.C. 102(g), a reference is not prior art if it was "abandoned, suppressed, or concealed."  This can occur in one of two ways.  "The first is implicated when an inventor actively abandons, suppresses, or conceals his invention from the public.  The second occurs when abandonment, suppression, or concealment may be inferred

---

[6] At various points throughout its briefing, Martin has sought to redefine the claims and "intended purpose" of the claimed invention by importing several limitations discussed in the specification — *see, e.g.*, note 3 above.  Such importation would be inappropriate for it is "the words of the claims [that] define the scope of the patented invention" and not any further limitations set forth in the specification.

United States District Court

For the Northern District of California

based upon the prior inventor's unreasonable delay in making the invention publicly known." *Dow Chemical Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001). Martin has not specified which type of abandonment it alleges. Under either theory, however, there was no abandonment. Significantly, the parties have stipulated that the Visy machine was sold in the United States in 1996. There is no evidence that the sale was made in secret or that the Visy machine was hidden from the public. Instead, Martin only relies on the fact that no patent application was filed on the Visy machine and on its argument that nobody further developed the Visy design after March 1997. (No patent application was filed, it would appear, because no one thought it worthy of a patent.) Such scant evidence does not nearly rise to the level required for abandonment. As well, Martin never even requested that the jury be given an instruction regarding abandonment at the charging conference.

In addition, while a prior art reference "must be enabling in order to qualify as an anticipatory reference under Section 102(b), a reference may qualify as a prior art reference under Section 103 even if it is non-enabling." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1577 (Fed. Cir. 1991). Accordingly, assuming *arguendo* that the Visy machine did not "work for its intended purpose," it would still be an appropriate obviousness reference for anything that it did teach. Plainly, it used and taught the hydraulic apparatus later claimed by Martin.

**B.      The Pallmac Machine.**

The "Pallmac Omni-Separator" was a bundle breaker designed by a different competitor in Europe and built and sold in the United States beginning in 1995. Pallmac went through two different designs. The first design implemented a spring system. The upper-clamping mechanism was fitted with springs and rigid members. The lower-clamping members could rise to elevate the incoming logs to the upper-clamping mechanism. In this way, logs were conveyed into the machine and clamped by the lower-clamping members against the springs and rigid members of the upper-clamping mechanism. This design did not use the hydraulic principle (but used springs that acted independently of each gripper).

With time, however, Pallmac switched to a new design because the spring-based system required too much maintenance. The springs on the upper clamping mechanism were eliminated

altogether.  The new design had rigid members and a compliance structure on the bottom of the machine as shown below.  This second design used the hydraulic principle.  This too was prior art.



View Of Pallmac Conveyor Belts and Rigid Members

Logs were moved onto the machine using a series of "rope conveyors."  The rigid members (which were attached to an air bladder and were interleaved between the rope conveyors) would rise and could deform depending on the height of the logs being broken.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



View of Rigid Members and Breaking

The air bladder was simply a "fire hose."  As seen below, the fire hose was essentially a long tube with compressed air inside that was clamped and sealed on both ends.



End View of Fire Hose

14

United States District Court

For the Northern District of California

1   Although this design was partially disclosed to the examiner, Alliance argues the disclosure was

2   inadequate or incomplete.[7]

3          At trial, Martin did not dispute that the Pallmac machine had a compliance structure with a

4   flexible member (the fire hose).  Martin Inventor Talken admitted as much during his examination.

5   The primary difference highlighted by Martin between the Pallmac machine and the claimed

6   invention was that the Pallmac machine clamped incoming logs with a compliance structure from

7   the *bottom* whereas the claimed invention did so from the *top*.  The only other alleged significant

8   differences were that the Pallmac did not have "closely spaced" rigid members as defined in claim

9   7 and that it did not have a structure able to "receive and hold at least two bundles broken

10  successively" as provided in claims 13 and 14.

11                      **C.      The Tecasa Machine.**

12         The Tecasa bundle breaker was made by another competitor in the corrugated-cardboard

13  industry.  At trial, the parties stipulated that the Tecasa machine met every limitation of every

14  asserted claim and that it was known or used in the United States as of June 2002.  Again, the

15  '566 application was filed on August 28, 2002.  The sole issue for the jury to decide with respect

16  to the Tecasa machine was whether or not Martin had reduced its invention to practice before

17  June 2002.  This order assumes that Martin did so (but please see the appendix to this order).

18  The Tecasa machine, however, remains still relevant in assessing secondary considerations, for it

19  plainly shows "simultaneous invention" as an indicia of obviousness.[8]

20              **2.      DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION.**

21         "[W]hen a patent 'simply arranges old elements with each performing the same function it

22  had been known to perform' and yields no more than one would expect from such an arrangement,

23  the combination is obvious."  *KSR*, 127 S.Ct. at 1740 (*quoting Sakraida v. Ag Pro, Inc.*, 425 U.S.

24  ────────────────

25         [7] This order assumes that the Pallmac design with the compliance structure was fully disclosed to the examiner.

26         [8] In addition, and as a tangential point, it is worth noting that to meet its burden of proving an earlier
    invention date, Martin relied on an inventor notebook and verbal testimony regarding the early testing of
27  Martin's bundle breaker.  This is the same type of evidence that Martin has criticized  in conjunction with the
    Visy machine.  While Martin does argue that the evidence it used to prove an earlier invention date was vastly
28  more complete than that proffered for the Visy machine, the fact remains that there is, at a minimum, a
    similarity in proof.

273, 282 (1976)).  This is such a case.  Martin's claimed invention is no more than a simple combination of well-known features established in the prior art — in particular, the Visy and Pallmac machines.

The alleged differences are minimal.  With respect to the Visy machine, Martin asserts that the Visy machine had no compliance structure and that its rigid members were not "closely spaced" as provided in claim 7.   The term "closely spaced" was not construed and instead was given its ordinary and plain meaning.  For the reasons set forth earlier, this order rejects Martin's argument that the Visy machine did not have a compliance structure.

As for the spacing, it is true that there was somewhat greater spacing on the Visy machine than the Martin machine.  According to Martin, this led the Visy machine to dent some logs during the breaking process.  Nonetheless, if this was a legitimate problem, it was easily fixed.  "[T]he common sense of those skilled in the art demonstrates why some combinations would have been obvious where others would not." *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007).  Both sides acknowledged at trial the fundamental principle that the force exerted on a log is directly proportional to the pressure being applied and the specific area it is applied to.  In particular, force is the product of pressure and area — *i.e.*, Force = Pressure x Area.  Martin Inventor Talken admitted that this fundamental and basic principle of physics was readily applicable to the field of mechanical engineering and the design of machines like a bundle breaker.  Therefore, if the Visy machine dented bundles, then that risk could have been reduced by enlarging the surface area of the grippers, which might have consumed some of the empty space between the grippers.  This simple solution would have been apparent to one having ordinary skill in the art. [9] [10]

---

[9] The main disadvantage to positioning the grippers more closely together was that there would be a greater likelihood that a single gripper might straddle both logs being broken.  Such a circumstance might be undesirable because the gripper would be lowered onto both logs creating a possible imbalance in the pressure applied to both.

[10] Martin also contended at trial that the Visy machine did not have a flexible member having "a width extending substantially the width" of the logs as stated in claim 4.  Even if this contention were true, however, Martin did not dispute that the Pallmac machine met this limitation.  One of ordinary skill in the art, having both devices in view, would have readily been able to recognize the possible combination.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

With respect to the Pallmac machine, the main difference alleged was strictly limited to the top versus bottom issue.  The Pallmac machine had its compliance structure on the *bottom* of the stack, whereas the claimed invention did so on the *top* of the stack.  Martin's Expert Karvelis admitted that there were only a discrete number of possible design options for choosing the location of the compliance structure (Tr. 1861:18–23):

> Q.  And you'd also agree that it would be readily apparent to one of ordinary skill in the art that if one wanted to add compliance to a two-part clamp, there are basically three permutations.  You could do it on the top clamp, you could do it one the bottom clamp, or you could do it on both clamps?
>
> A.  That's correct.  That's what I said in my report.

Karvelis went on to explain that the disadvantages to using the bottom approach were that the logs would be exposed to "racking and lifting" which could lead to disarrangement and the design would have to include conveyor ropes which surrounded the rigid members.  Conversely, one advantage of using the bottom approach was the ability to clamp closer to the plane of weakness in the logs.  A top approach had corresponding advantages and disadvantages.

"When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."  *KSR*, 127 S.Ct. at 1742.  *Here, the design options were well defined.  The device could clamp and deform from the bottom, the top, or both*. Pallmac is an example where the designer chose to implement a *bottom* approach.  On the other hand, Visy is an example where the *top* approach was employed.  A skilled artisan would have plainly known these two options, indeed the only two possible solutions, appreciate the advantages and disadvantages to each, and design accordingly.  Just as *KSR* teaches, the options were limited

United States District Court

For the Northern District of California

1    (here limited to two:  top or bottom), were foreseeable, and the differences of minor importance in

2    terms of achieving compliance.[11] [12]

3                                    *                *                *

4            In sum, the differences between the prior art and the claimed invention, if any, were quite

5    minimal.  The hydraulic compliance structure had already been used in both the Visy and Pallmac

6    machines and any other slight variations between the prior art and the '566 patent would have been

7    apparent to one having ordinary skill in the art to adopt.  The practice of breaking multiple logs

8    across was already well known.  Viewing the prior art in whole, therefore, this order finds that on

9    the primary obviousness factors that the evidence is clear and convincing that there is no legally

10   sufficient basis on the record for a reasonable jury to conclude that all asserted claims of

11   '566 patent are non-obvious.

12       **3.      SECONDARY CONSIDERATIONS.**

13           The Federal Circuit has held that "secondary considerations, when present, must be

14   considered in determining obviousness."  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir.

15   2000); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)

16   ("[E]vidence of secondary consideration may often be the most probative and cogent evidence in

17   the record.  It may often establish that an invention appearing to have been obvious in light of the

18   prior art was not.  It is to be considered as part of all the evidence, not just when the decisionmaker

19   remains in doubt after reviewing the art").  Originally, three factors were regarded as secondary

20   considerations:  commercial success, long-felt but unsolved needs, and failure of others.

21   *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).  Since then, several additional

22   factors have been taken into account by the Federal Circuit, including:  copying by others, praise

23   ────────────────

24       [11] During his examination, Dr. Karvelis went on to explain that while the three options were apparent
to those skilled in the art, he believed the '566 patent was the first device to successfully implement a top
25   approach.  Dr. Karvelis' opinion, however, was premised on the incorrect assumption that the Visy machine was
a complete failure and of little consequence to the claims.  His opinion is therefore rejected.

26       [12] Martin also contended that the Pallmac machine did not have closely spaced rigid members and a
structure able to "receive and hold at least two bundles broken successively" as provided in claims 13 and 14.
27   For the same reasons set forth in regard to the Visy machine, even if the Pallmac's rigid members were not
"closely spaced," such modification would have been obvious.  As to the "two bundles broken successively"
28   limitation, although there is competing evidence as to whether the Pallmac machine had such a capability, a
skilled artisan could have made the necessary modifications in view of Visy.

                                                    18

United States District Court

For the Northern District of California

1   of the invention, unexpected results, disbelief of experts, general skepticism of those in the art,

2   commercial acquiescence, and simultaneous development.[13]

3          According to Martin, the evidence of secondary considerations presented at trial shows that

4   the claimed invention was non-obvious.  Martin relies on the following:  (i) the purported success

5   of Martin's own bundle breaker; (ii) emails and documents written by Alliance employees

6   expressing competitive concern of Martin's bundle breaker; and (iii) an alleged long felt need in

7   the industry.  Alliance, in response, argues that the alleged success of Martin's bundle breaker was

8   not caused by anything inventive but, instead, because Martin had strong market power in the

9   field.  In addition, the Tecasa machine (which Martin stipulated read on all asserted claims) was

10  invented and sold before the filing date of the '566 patent.  Martin presented evidence of an earlier

11  invention date in order to swear behind Tecasa.

12         It is true that Martin's bundle breaker was a commercially successful product — one that

13  Alliance envied in emails.  As well, Alliance's allegedly infringing bundle breaker was also

14  successful.

15         That fact cannot alter the fact that nearly every single person or entity who encountered the

16  lack of compliance problems in the industry came up with the same general hydraulic design to

17  manage it.  In 1995, Travis Hanson, a recent graduate from college, was given the task by his

18  employer to solve the compliance problem of trying to break multiple logs of varying heights with

19  a bundle breaker.  He came up with the following design:



---

[13] *See Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1379–80 (Fed. Cir. 2000); *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 885 (Fed. Cir. 1998); *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285–85 (Fed. Cir. 1988); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1144 (Fed. Cir. 1985); *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

United States District Court

For the Northern District of California

Hanson's Design in 1995

His design included a series of air bags connected by air tubing that could deform to the specific height of the log being broken.  Eight machines based on Hanson's design were sold to Visy.

Seven years later, Martin was faced with the same problem and solved it in the same way. The design provided to the United States Patent and Trademark office is below:



Martin's Design in 2002

These designs are amazingly similar.  As with Hanson's design, Martin used a hydraulic compliance structure that deformed to the height of the logs.  Martin's hydraulic design was not new.  In fact, years earlier, around the same time-frame that Hanson came up with his design, mechanical engineers in Europe working for Pallmac solved the lack of compliance problem by attaching an air-deforming compliance structure to the bottom of their bundle breaker.  Yet again, in June 2002 — months before the '566 application was filed — engineers at Tecasa came up with the same hydraulic solution to the same problem.  Indeed, the record is void of any evidence showing that anyone in the industry even used a different design solution.[14]

Taking this into account, this order finds that the secondary considerations also weigh in favor of a finding of obviousness.  The simple fact is that when faced with the same problem the '566 patent is directed to solve, a number of previous (Pallmac, Visy) or contemporaneous (Tecasa) designers were led to the hydraulic solution.  The claimed invention did not yield "unexpected results," a "disbelief by experts," or any "general skepticism."  The reasons for this

---

[14]  Although presented under the secondary considerations portion of this order, these facts are equally applicable to the primary obviousness factors discussed above.

were simple.  The hydraulic principle was already known.  The "invention" already discovered.
And the design so acknowledged that any skepticism would have been disingenuous.

## CONCLUSION

The evidence on primary considerations and on secondary considerations is so lop-sided in
favor of obviousness that *KSR* dictates that judgment be entered as a matter of law in favor of
defendant.  For these reasons, Alliance's Rule 50 motion is **GRANTED**.  All other pending Rule 50
motions are **MOOT**.  Judgment will be entered for defendant.


**IT IS SO ORDERED.**


Dated:  November 17, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE